IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:15-cr-00127(1)(2) |
| PLAINTIFF, | : | Judge Thomas M. Rose |
| v. | : | |
| SCOTT A. TRAUM, et al. | : | |
| DEFENDANTS. | : | |

_____

**ENTRY AND ORDER DENYING THE MOTIONS TO SUPPRESS (DOCS. 87, 88) BROUGHT BY DEFENDANTS SCOTT A. TRAUM AND JOEY LIGHTCAP TRAUM**
_____

This case is before the Court on the Motions to Suppress (Docs. 87, 88) filed by Defendants Scott A. Traum and Joey Lightcap-Traum. ("Defendants"). For the reasons below, the Court **DENIES** the Motions to Suppress.

I.   **BACKGROUND**

In February 2015, the Southern District of Ohio Financial Crimes Task Force ("Task Force") began an investigation into U.S. Beef Cincinnati, LLC ("U.S. Beef"), a retail meat distributor owned by the Defendants. (Doc. 115 at 2.) U.S. Beef was suspected of engaging in federal food stamp fraud. (*Id*.) Specifically, U.S. Beef was suspected of accepting Supplemental Nutrition Assistance Program ("SNAP") benefits from electronic benefit transfer ("EBT") cards in exchange for cash and drugs as well as other unauthorized items. (*Id*.)

On August 20, 2015, Special Agent Gregory Engelhard ("Engelhard") of the U.S. Department of Agriculture ("USDA"), Office of Inspector General applied for two search warrants covering the Defendants' residence in Hamilton, Ohio; the U.S. Beef business premises in Fairfield, Ohio; and several vehicles. (*Id*.; Doc. 106 at 2.) The applications for both warrants

were supported by an affidavit by Engelhard. Magistrate Judge Michael R. Newman determined that probable cause existed for issuance of the warrants, which were then executed on August 26, 2015. (Doc. 115 at 2.) On September 24, 2015, a federal grand jury indicted the Defendants and six others connected to U.S. Beef on 29 counts. (*Id*.)

On March 2, 2016, Defendants filed their respective Motions to Suppress. (Docs. 87, 88.) The Government filed an initial reply memorandum (Doc. 91) and the Court held an evidentiary hearing on May 3, 2016. (Doc. 113.) Engelhard was the only witness who testified at the hearing. (*Id.*) The parties submitted post-hearing memoranda (Docs. 106, 112, 115, 118, 120) and the Motions to Suppress are now ripe for review. Defendants, who share the same residence, raise the same arguments in their Motions to Suppress. The Court considers the Motions to Suppress together in this Order.

## II.  LEGAL STANDARD

The Fourth Amendment to the United States Constitution protects the rights of individuals against unreasonable searches and seizures. *United States v. Ganias*, 755 F.3d 125, 133 (6th Cir. 2014). A search occurs when the Government acquires information by either "physically intruding on persons, houses, papers, or effects" or otherwise invades an area in which the individual has a reasonable expectation of privacy. *Id.* (citing *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013)). "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Id.* (citing *United States v. Jones*, 132 S. Ct. 945 n.5 (2012)). The party seeking suppression of evidence obtained by a search has the burden of proving that the search was unlawful. *United States v. Blakeney*, 942 F.2d 1001, 1014 (6th Cir. 1991).

A search warrant will issue only if "(1) the Government establishes probable cause to believe the search will uncover evidence of a specified crime; and (2) the warrant states with particularity the areas to be searched and the items to be seized." *Ganias*, 755 F.3d at 134. Probable cause "is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The Supreme Court has opined that:

> Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision [whether to issue a warrant]. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause."

*Gates*, 462 U.S. at 235 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). Accordingly, the magistrate judge's task "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238-39. When reviewing the magistrate judge's decision, this Court must determine only whether there was a "substantial basis" for the finding that probable cause existed. *Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "The ultimate touchstone of the Fourth Amendment is reasonableness." *Ganias*, 755 F.3d at 134 (citing *Missouri v. McNeely*, 133 S. Ct. 1552, 1569 (2013)).

### III. ANALYSIS

Defendants make four arguments in their Motions to Suppress: (1) that the search warrant issued for U.S. Beef's business premises, Defendants' residence, and certain vehicles was not

3

supported by probable cause as required by the Fourth Amendment; (2) that the application for the search warrant failed to establish a factual nexus between the alleged criminal activities and the locations to be searched; (3) the search warrant violated the Fourth Amendment because it was overly broad; and (4) the affidavit supporting the search warrant contained false or misleading information and omitted material information, which, if included, would have demonstrated that no probable cause existed for issuance of the warrants.  The Court addresses each of these arguments in turn below.

    **A.**    **Defendants' Probable Cause Argument**

Defendants' first argument is that Engelhard's affidavit did not establish probable cause to search U.S. Beef's business premises, Defendants' residence, and two vehicles—a 2007 Chevrolet Corvette and 2003 Hummer H2.  (Doc. 106 at 8-9; Doc. 112 at 2.)

    **1.  U.S. Beef's Business Premises**

Substantial evidence supports the Magistrate Judge's finding of probable cause to search U.S. Beef's premises.  Engelhard was investigating suspected federal food stamp fraud, and specifically the illegal exchange of SNAP benefits for cash or drugs.  The affidavit describes fifteen such transactions between U.S. Beef employees or representatives.  Doc. 1-1 at ¶¶ 23, 25, 27-29, 32, 44, 49.  In those transactions, the U.S. Beef representatives used U.S. Beef's EBT processing equipment to obtain the SNAP benefits from EBT cards.  *Id.*  U.S. Beef is purportedly in the business of selling meat products, but was receiving proceeds from drug sales and the exchange of SNAP benefits for cash.  It stands to reason that such transactions would create an accounting problem, in that U.S. Beef's inventory and sales of meat products would not square with the revenue coming into the company.  As a result, it is likely that evidence of the

illegal transactions would exist in U.S. Beef's books and records.

Defendants argue that rogue employees engaged in the illegal transactions without the authorization or knowledge of U.S. Beef. That argument might be plausible if the employees were engaging in side transactions that did not involve processing SNAP benefits through U.S. Beef's EBT processing equipment. The exchange of SNAP benefits is central to the illegal transactions, and therefore requires the involvement of U.S. Beef. The SNAP benefits processed through U.S. Beef are deposited into bank accounts controlled by Defendants, as the company's owners and managers. In order for the U.S. Beef employees to receive the profits from their illegal transactions, they needed to be compensated by U.S. Beef. Transforming the proceeds from the exchange of $3,008.00 in SNAP benefits for thirteen 30mg oxycodone pills and $540.00 in cash (Doc. 1-1 at ¶ 32) into a commission on meat product sales would also present an accounting problem for U.S. Beef. It may be that Defendants can present a defense at trial showing that the employees who engaged in the illegal transactions also duped their managers into believing that all of their sales came from meat products. Nevertheless, there was substantial evidence before the Magistrate Judge to conclude that U.S. Beef was involved at some level.

Among the evidence that U.S. Beef was involved in the fraud, and knew that its employees were engaged in illegal transactions, are comments made by its employees. For example, during a SNAP benefits for cash transaction on April 3, 2015, a U.S Beef employee called Defendant Joey Lightcap-Traum to have her manually enter the EBT card information at the U.S. Beef office. (Doc. 1-1 at ¶ 28.) After concluding the call, the employee told the confidential informant that "she knows what the deal is, but I don't want to put her on front street." (*Id.*) It is reasonable to infer from this statement that Defendant Lightcap-Traum understood that U.S. Beef employees

5

were engaging in illegal transactions—she knew "what the deal is"—but the employee wanted to insulate her from direct participation in the fraud to the extent possible—he didn't "want to put her on front street." As mentioned above, on May 1, 2015, two U.S. Beef employees allegedly exchanged $3,008.00 in SNAP benefits for thirteen 30mg oxycodone pills and $540 in cash. (*Id.* at ¶ 32.) One of those employees was co-defendant Dalton Andrew Traum, who is Defendants' son. As part of the May 1st transaction, Dalton Traum agreed to take the money from the SNAP benefits received to purchase additional oxycodone to complete the transaction. (*Id.*) Dalton Traum commented to the confidential informant that "he had to 'cash these out with dad' referring to the SNAP EBT cards." (*Id.*) This statement places Defendant Scott Traum in the middle of an illegal drug transaction. To purchase the oxycodone and complete the transaction, Dalton Traum would need to receive cash directly from his father for the SNAP benefits. Dalton Traum could not wait for the proceeds to be processed through U.S. Beef and returned to him through compensation—presumably as purported commissions on meat sales. It is therefore reasonable to infer that Defendant Scott Traum at least participated in the illegal transaction—whether knowingly or unknowingly is uncertain.

It bears noting, however, that neither Defendants nor U.S. Beef needs to have knowingly participated in the fraud to support the finding of probable cause to search U.S. Beef's business premises. Evidence of the alleged crimes was likely to be found in U.S. Beef's books and records, whether or not U.S. Beef had any idea what was going on, because the proceeds from the illegal transactions had to be processed through U.S. Beef.

There is a substantial basis for the Magistrate Judge's finding of probable cause to search U.S. Beef's business premises.

### 2. Defendants' Residence

Defendants argue that there was not probable cause supporting the warrant for their residence because the only connection between it and the alleged criminal activity is that Defendants commuted from their residence to work at U.S. Beef. (Doc. 106 at 8.) This argument fails because Engelhard's affidavit contains more information connecting the residence to the illegal activity than suggested by Defendants' memoranda.

The Court discussed above the connection between the illegal SNAP benefits transactions and U.S. Beef. Defendants are the owners and managers of U.S. Beef. That fact alone does not establish a fair probability that evidence of the illegal transactions will be found at their residence, but it does provide a foundation. Engelhard's affidavit describes several trash pulls that were made at Defendants' residence. One trash pull recovered mailings confirming that it was in fact their residence. (Doc. 1-1 at ¶ 41.) A second trash pull recovered "various US BEEF business documents, to include both banking and US BEEF daily consignments logs listing the business address of 3210 Profit Drive, Fairfield, Ohio 45014." (*Id.* at ¶ 43 (emphasis in original).) Engelhard also testified in his affidavit that, based on his "training, experience and participation in financial investigations, and upon the experience and knowledge of other agents and officers of the [Southern District of Ohio Financial Crimes Task Force]," it is common for individuals involved in food stamp fraud to conceal records and evidence of their fraudulent activity at their residence and business. (*Id.* at ¶ 80.) Engelhard also stated that cash embezzlers tend to "refrain from depositing all of it into bank accounts for fear of alerting authorities" and, as a result, they "often keep bulk currency at their residence, in safes, vehicles, etc." (*Id.*) Together, these facts constitute a substantial basis for the Magistrate Judge's finding of probable cause.

### 3.  The 2007 Chevrolet Corvette and 2003 Hummer H2

Defendants specifically challenge whether probable cause existed to search two vehicles: a 2007 Chevrolet Corvette and 2003 Hummer H2.   The Court finds that there is a substantial basis for the Magistrate Judge's finding of probable cause to search these two vehicles.

The Corvette was registered to Defendant Joey Lightcap-Traum and purchased with funds from a bank account used for U.S. Beef business.  (Doc. 1-1 at ¶¶ 13, 17-19, 53.)   Engelhard's affidavit further indicates that insurance payments for the vehicle were made from accounts used for U.S. Beef business.  (*Id.* at ¶ 54.)   Federal agents observed Defendant Lightcap-Traum driving the Corvette in the performance of her duties as the owner and manager of U.S. Beef.  (*Id.* at ¶ 55.)   Defendants argue that the mere fact that Lightcap-Traum drove the Corvette to and from work is not enough to create a link between it and potential evidence of any crime.  (Doc. 106 at 8.)   Lightcap-Traum's driving of the Corvette, however, was not the only fact before the Magistrate Judge.   The Magistrate Judge also had evidence before him that Lightcap-Traum was aware that U.S. Beef employees were engaging in illegal SNAP benefits for cash transactions (Doc. 1-1 at ¶ 28) and that at least some U.S. Beef business was conducted from her residence. (*Id.* at ¶¶ 43-46.)   All of these facts, when considered together, constitute a substantial basis for the finding of probable cause to search the Corvette.

Like the Corvette, the Hummer H2 is registered to Lightcap-Traum and was purchased with funds from a bank account used for U.S. Beef business.  (*Id.* at ¶¶ 67-68.)   Insurance payments for the Hummer H2 also appear to have been made out of an account used for U.S. Beef business.  (*Id.* at ¶ 68.)   Federal agents observed the Hummer H2 being driven daily by Defendant Scott Traum, Defendant Lightcap-Traum, and co-defendant Dalton Traum while

conducting business for U.S. Beef. (*Id.* at ¶ 69.) Defendants make the same argument for suppression of any evidence seized from the Hummer H2 as they made for the Corvette. For that reason, the same evidence discussed above regarding the Corvette also supports the finding of probable cause as to the Hummer H2. Here, however, the evidence supporting that finding is even stronger because Dalton Traum was observed driving the Hummer H2. Dalton Traum engaged in several illegal transactions with a confidential informant while ostensibly working on behalf of U.S. Beef *from his vehicle*. It is therefore more likely that evidence of the alleged crimes might be found in a vehicle driven by Dalton Traum. Substantial evidence supports the finding of probable cause to search the Hummer H2.

### B. Whether the Affidavit Established a Nexus With the Locations To Be Searched

The above discussion of whether probable cause existed for the search of the U.S. Beef business premises, Defendants' residence and the two vehicles at issue demonstrates the connection between those locations and the alleged criminal activity. No further discussion is therefore required here. Defendants' argument that Engelhard's affidavit failed to establish the requisite nexus between the locations to be searched and the alleged criminal activity is rejected.

### C. Whether the Search Warrant Was Overly Broad

Defendants argue that the warrant, as it applies to the search of computers, fails to satisfy the Fourth Amendment's particularity requirement. *See United States v. Grubbs*, 547 U.S. 90, 97 (2006). The Fourth Amendment requires that a warrant describe with "particular[ity] . . . the place to be searched and the persons or things to be seized." "The purpose of this particularity requirement is to prevent the use of general warrants authorizing wide-ranging rummaging searches in violation of the Constitution's proscription against unreasonable searches and

9

seizures." *United States v. Logan*, 2505 F.3d 350, 364-65 (6th Cir. 2001). Whether a warrant lacks the necessary particularity is determined on a case-by-case basis. *Id.* at 365; *see also United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000). If a search warrant is determined to be overbroad, then the Court should invalidate the overbroad portions of the warrant and suppress the evidence seized pursuant to those portions. *See United States v. Greene*, 250 F.3d 471, 476-77 (6th Cir. 2001).

The Sixth Circuit has held that, "granting the Government a *carte blanche* to search every file on [a computer] hard drive impermissibly transforms a limited search into a general one." *United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011) (quoting *United States v. Stabile*, 633 F.3d 219, 237 (3d Cir.2011)). However, the Sixth Circuit also has held with regard to computers that "it is folly for a search warrant to attempt to structure the mechanics of the search and a warrant imposing such limits would unduly restrict legitimate search objectives." *Id*. (quoting *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009)). The Sixth Circuit agreed with the Tenth Circuit's reasoning in *Burgess*, which stated:

> One would not ordinarily expect a warrant to search filing cabinets for evidence of drug activity to prospectively restrict the search to "file cabinets in the basement" or to file folders labeled "Meth Lab" or "Customers." And there is no reason to so limit computer searches. But that is not to say methodology is irrelevant.

*Burgess*, 576 F.3d at 1094. The Tenth Circuit further held "[a]s the description of such places and things becomes more general, the method by which the search is executed become[s] more important—the search method must be tailored to meet allowed ends." *Id*. The *Burgess* Court, however, noted "there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders…." *Id*.

Here, Engelhard listed the items that were the target of the search in Attachment B to his

10

affidavit. That list was sufficiently particularized to limit the search to items related to the U.S. Beef business and the alleged food stamp fraud, e.g., "[b]ooks, records, invoices, vouchers, business logs, and any other documentation relative to the daily operations of a business indicating the profit and expenses specific to **US BEEF CINCINNATI LLC, dba US BEEF,** *3210 Profit Drive, Fairfield, Ohio 45014,* and/or **SCOTT TRAUM** and **JOEY LIGHTCAP-TRAUM,** *5935 Orchard Hills Lane, Cincinnati, Ohio 45252*." (Doc. 91-3 at 3 (emphasis in original).) Specifically as to computers and electronic media, Attachment B states that "[d]ue to the fact that some or all of the above-described records may be stored by means of a computerized information system, the items and materials to be searched shall include," among others, (1) information and data stored as magnetic or electronic coding on computer media, (2) electronic devices, including computers and computer components, (3) instructions and programs stored as electronic or magnetic media, and (4) materials regarding the operation of a computer system or equipment. (Doc. 91-3 at 3-4.) It stands to reason that, in a search for documents relating to the operation of a business engaged in fraud, one of the repositories of such documents would be computers and electronic media at the locations to be searched.

Defendants specifically argue that the search of computers was impermissibly broad because officers were permitted to search any computer based merely on their suspicion that it might "possibly" contain evidence of the alleged crimes. Defendants cite Engelhard's affidavit, which states in pertinent part:

> Because several people share the subject target PREMISES as a business location and a residence, it is possible that the subject target PREMISES will contain computers that are predominantly used, and perhaps owned, by third persons who are not suspected of a crime. If agents conducting the search nonetheless determine that it is possible that the listed items of evidence sought in the proposed warrant could be found on any of those computers or storage media, this

11

>application seeks permission to search and if necessary to seize those computers or storage media as well.  It may be impossible to determine, on scene, which computers or storage media contain the things described in this warrant.  If, any computer has to be seized, the computer and its components may be searched and analyzed at an offsite location as authorized by the search warrant issued pursuant to this affidavit.

(Doc. 1-1 at 41.)  Defendants reason that permitting the officers executing the warrant such discretion violates the Fourth Amendment.

In *Richards*, the Sixth Circuit recognized that, "given the unique problem encountered in computer searches, and the practical difficulties in implementing universal search methodologies, the majority of federal courts have eschewed the use of a specific search protocol and, instead, have employed the Fourth Amendment's bedrock principle of reasonableness on a case-by-case basis."   659 F.3d at 538.   Applying this principle, "'[w]hile officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant, . . . a computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause.'"  *Id.* (quoting *Burgess*, 576 F.3d at 1092).

Defendants distinguish *Richards* because it involved child pornography and "the nature of the criminal activities inherently involved use of computers and hard drives."   (Doc. 118 at 6.) While this case does not involve child pornography, it is reasonable to include computers within a search for evidence of food stamp fraud.   In addition, the warrant was sufficiently clear as to the objects of the search to cabin the officers' judgment.  Some discretion was necessary because Engelhard did not know, ex ante, what the officers might find in the locations to be searched. "The prohibition of general searches is not to be confused with a demand for precise ex ante knowledge of the location and content of evidence. . . .   The proper metric of sufficient specificity

12

is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." *Richards*, 659 F.3d at 541 (quoting *United States v. Meek*, 366 F.3d 705, 716 (9th Cir.2004)). Having established probable cause to search the house, it was reasonable to permit the officers to use their judgment in determining what computers in the house might contain the objects of the search. Defendants do not argue that the manner in which the officers actually executed the search of computers was overly broad. Rather, Defendants argue that the scope of the warrant, as written, was overly broad. The Court finds that it was reasonable under the circumstances and did not violate the Fourth Amendment's particularity requirement.

### D. Whether the Affidavit Contained False or Misleading Information or Omitted Material Information

Defendants argue that Engelhard was reckless as to the truth of material information in his supporting affidavit and, as a result, the Magistrate Judge was misled into finding probable cause for issuance of the search warrant. Specifically, Defendants argue that the Magistrate Judge was misled by the statement in Engelhard's affidavit that Defendants "repeatedly, continually, and illegally acquired and redeemed SNAP benefits in exchange for ineligible items . . . during the time frame of December 11, 2011 until the date of this affidavit [August 20, 2015]." (Doc. 1-1 at ¶ 8.) Defendants argue that this statement is misleading because the confidential informant on whom Engelhard relied "did not have any personal knowledge of Joey L. Traum or Scott Traum." (Doc. 106 at 5.) The Court does not take this statement to be a representation that Engelhard had direct evidence that Defendants entered into illegal SNAP benefits transactions. Rather, the Court reads this statement as the conclusion reached by Engelhard based on the evidence presented in the affidavit. Upon reading the entire affidavit, which the Magistrate Judge surely did, it is evident that the confidential informant directly engaged only U.S. Beef employees in illegal

13

transactions. Other evidence—such as the evidence discussed in the first part of the Court's analysis—supports an inference that Defendants were involved in the fraud as well.

Defendants also cite to the description of "numerous complaints from the Better Business Bureau" regarding U.S. Beef as misleading and irrelevant. At the hearing on the motions to suppress, Engelhard testified that the complaints to the Better Business Bureau related to the quality of the meat products that consumers allegedly did not receive or request. (Doc. 103 at 950:23-951:4.) The affidavit does not mischaracterize the nature of the complaints. For example, the affidavit states:

> US BEEF has received numerous complaints from consumers claiming that representatives are too pushy and aggressive when dealing with potential customers, representatives fail to properly honor refunds upon consumer request, representatives commonly overcharge and double-bill credit and EBT paying customers and prey on the elderly and unsuspecting consumers. Most overcharge and double-billing complaints fail to be corrected and simply ignored by US BEEF representatives and ownership. Product quality and integrity have also been questioned by several consumers who purchased meat from US BEEF and claim their purchased meat were inedible due to company negligence involving the handling safeguards commonly practiced with frozen meat products.

(Doc. 1-1 at 22-23.) These complaints are not direct evidence that U.S. Beef was engaged in illegal SNAP benefits transactions. However, one possible inference is that U.S. Beef is the subject of frequent consumer complaints because it is not a legitimate meat products business, but merely a front for a conspiracy to commit SNAP benefits fraud. This is not the only inference that may be taken from these complaints; and that inference alone could not support a finding of probable cause. Nevertheless, the Court does not find the inclusion of these complaints in the affidavit to be misleading or irrelevant.

Defendants argue that Engelhard should have included in his affidavit that U.S. Beef never registered greater than a "Level 2" ranking on the ALERT scale, a USDA Food Nutrition Service

14

algorithm used as an indicator of potential fraud activity. The ALERT scale ranges from Level 1 to Level 10, with a Level 10 indicating the strongest likelihood that the business is engaged in fraud.

Engelhard testified at the suppression hearing that U.S. Beef was at a Level 2 in October 2012 and dropped close to zero by November 2012. (Doc. 103 at 970-73.) U.S. Beef's ranking then remained at or near zero until the Government's confidential informant began making purchases from U.S. Beef drivers in February 2015. (*Id.*) The Court finds that Engelhard did not exclude the ALERT scale information from his affidavit in reckless disregard for the truth. *United States v. Rose*, 714 F.3d 362, 70 (6th Cir. 2013). That U.S. Beef did not register anything greater than a Level 2 ranking on the ALERT scale does not undermine the substantial evidence supporting the Magistrate Judge's finding of probable cause. The ALERT scale is just one indicator of fraud, not a litmus test capable of conclusively deciding the issue.

Finally, Defendants argue that the comparison between U.S. Beef and "similarly situated meat delivery services" in Engelhard's affidavits was fundamentally flawed and therefore misleading. (Doc. 106 at 6-6.) Defendants' argument here is well-founded. Engelhard testified at the suppression hearing that the business used as a comparator was Schwan's, a company that delivers "a whole bunch of stuff . . . which is unique to them themselves [sic]. They don't have specialty services so to speak where it is just meat, seafood and poultry." (Doc. 103 at 960:1-12.) Based on a comparison between Schwan's and U.S. Beef, Engelhard estimated in his affidavit that U.S. Beef engaged in fraud totaling $906,420.88. Even if including the comparison to Schwan's in the affidavit was reckless as to the truth, it was not necessary to the Magistrate Judge's finding of probable cause. Indeed, in the Court's own analysis of whether substantial evidence exists to

15

support the finding of probable cause, the Court does not discuss this comparison.   As a result, it does not require the suppression of any evidence under *Franks v. Delaware*, 438 U.S. 154 (1978). *See United States v. Zimmer*, 14 F.3d 286, 288-89 (6th Cir. 1994).

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motions to Suppress (Docs. 87, 88) are **DENIED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, September 12, 2016.

s/Thomas M. Rose

THOMAS M. ROSE  
UNITED STATES DISTRICT JUDGE